UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LANIER MCPHERSON,

     Petitioner,                                 Case No. 06-13357

v.

GREG McQUIGGIN,                           HON. AVERN COHN

     Respondent.

_____/

## MEMORANDUM AND ORDER
## GRANTING THE PETITION FOR WRIT OF HABEAS CORPUS ON PETITIONER'S FIFTH CLAIM
## AND
## GRANTING A CERTIFICATE OF APPEALABILITY ON THE REMAINING CLAIMS

### I. Introduction

This is a habeas case under 28 U.S.C. § 2254. Petitioner Lanier McPherson, (Petitioner) is a state inmate at the Chippewa Correctional Facility in Kincheloe, Michigan. He is serving a sentence of life imprisonment without parole for first-degree murder, Mich. Comp. Laws § 750.316; three and a half to five years for being a felon in possession of a firearm, Mich. Comp. Laws § 750.224f; and two years in prison for possession of a firearm in the commission of a felony, Mich. Comp. Laws § 750.227b.[1]

Petitioner, through counsel, has filed a petition for writ of habeas corpus, presenting six claims, claiming that he is incarcerated in violation of his constitutional

_____

[1]Since the filing of his habeas petition, Petitioner has been transferred to the Chippewa Correctional Facility. Because the proper respondent is the warden of the facility where the petitioner is incarcerated, *see Edwards Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See also* Rule 2(a), 28 foll. U.S.C. § 2254, Greg McQuiggin is substituted as Respondent.

rights.  Respondent, through the Attorney General's Office, has filed a response, arguing that petitioner's claims are time-barred, procedurally defaulted, or lack merit.

For the reasons which follow, the petition will be conditionally granted on Petitioner's fifth claim for relief.  As will be explained, Petitioner's constitutional rights were violated when the police continued to question him after he invoked his right to counsel, which resulted in Petitioner making a statement that he shot the victims in self-defense.  At trial, Petitioner denied that he shot the victims.  Petitioner's contrary confession was admitted into evidence against him.  The state courts' decisions determining that Petitioner's rights were not violated is unreasonable.

Finally, the petition will be denied as to Petitioner's remaining claims.  A certificate of appealability will issue should Petitioner chose to appeal.

## II.  Procedural History

Petitioner was convicted of the above offenses following a jury trial in the Wayne County Circuit Court.  The Michigan Court of Appeals affirmed his conviction.  *People v. McPherson,* 263 Mich. App. 124 (2004).  The Michigan Supreme Court denied leave to appeal.  *People v. McPherson*, 472 Mich. 882 (2005).[2]

Petitioner then filed a petition for writ of habeas corpus.  The Court held the petition in abeyance while Petitioner returned to the state courts to exhaust additional claims.  *McPherson v. Harry*, 2007 WL 420378 (E.D. Mich. February 1, 2007).

Petitioner returned to state court.  There he filed a motion for relief from judgment, which the trial court denied.  *People v. McPherson,* No. 01-000730-01(Third

---

[2]Justices Cavanagh and Kelly would grant leave to appeal.

2

Circuit Court, Criminal Division, January 10, 2004).  The Michigan appellate courts denied leave to appeal. *People v. McPherson,* No. 288596 (Mich.Ct.App. April 23, 2009); *lv. den.* 485 Mich. 896 (2009).

On November 30, 2009, petitioner filed a motion to lift the stay of proceedings and an amended petition for writ of habeas corpus seeking relief on the following grounds:

> I.  The introduction of a deceased codefendant's custodial statement incriminating Petitioner, in violation of the trial court's ruling, violated Petitioner's constitutional rights of confrontation and to present a defense. U.S. Const. Amends. VI; XIV.
>
> II.  Petitioner was denied his Sixth Amendment right of confrontation when the trial court limited the cross-examination of the star prosecution witness for no adequate reason. U.S. Const. Amend. VI.
>
> III.  The state court prosecutor denied Petitioner a fair trial by multiple instances of misconduct. U.S. Const. Amend. XIV.
>
> IV.  Petitioner was denied a fair trial by the polygrapher's improper comment that innocent people never confess. U.S. Const. Amend. XIV.
>
> V.  Petitioner's rights under the Fifth and Sixth Amendments were violated when his involuntary confession, obtained following a four day delay in arraignment during which time he was repeatedly interrogated, was admitted against him and when the police failed to honor his request for an attorney during interrogation. U.S. Const. Amend. V, VI.
>
> VI.  A series of actions and omission by Petitioner's trial counsel violated Petitioner's Sixth Amendment right to the effective assistance of counsel.

### III.  Facts

The Michigan Court of Appeals accurately summarized the material facts leading to Petitioner's conviction as follows:

> On April 24, 2002, a jury found defendant guilty of the fatal shooting

of Abdul Scott. Shortly after the August 19, 2000, shooting in issue, the prosecution charged defendant, Delano Gaffney, and Marcelle Dorsey in this case, but at the preliminary examination, the charges against Gaffney and Dorsey were dismissed for insufficient evidence because Cherell King, who had implicated defendant, Gaffney, and Dorsey, failed to appear at the hearing. King, who was present with defendant, Gaffney, and Dorsey at the time of the shooting, was murdered before defendant's trial, and Gaffney and Dorsey were convicted of second-degree murder for the killing of King.

Defendant was tried in January 2002, but the trial court declared a mistrial because the jury was deadlocked. The jury in the second trial returned the convictions from which defendant appeals. At trial, the prosecution's theory of the case was that defendant, accompanied by Dorsey, Gaffney, and King, shot the victims because earlier on the day of the shooting the victims had laughed about the fact that Gaffney's car was stolen. Though defendant admitted at trial that he was present during the shooting, he claimed that King shot the victims.

Lucretia Thompson, defendant's girlfriend at the time of the shooting, testified that Gaffney, Dorsey, and King were defendant's friends. Thompson testified that on the morning of August 19, 2000, she drove King, defendant, and defendant's uncle to a funeral home on West Grand Boulevard in Detroit. Defendant asked Thompson to take a gun home with her and told her that the gun was not his, but that he did not want it at the funeral home. Defendant placed the gun under the driver's seat of the car, and Thompson drove home, but, later, defendant phoned her and told her to "forget it, bring it back." Thompson drove back to the funeral home, at which time defendant took the gun from the car.

Montez Meadows testified that on the morning of August 19, 2000, after she left an adult foster care home located at the intersection of West Grand Boulevard and Linwood, she saw two men (the victims) walking on West Grand Boulevard. She and the two men stood at the corner, waited for the traffic signal to change so they could cross the street, and she witnessed a car screech to a halt in front of them. Meadows testified that defendant and another person got out of the car and began running toward Meadows and the two men and that the two unknown assailants were shooting at them. Meadows and the two men she was standing with fell to the ground; both men were shot. Meadows testified that both defendant and the other man from the car had a gun, and that both were firing their guns, but she did not know which of the two guns fired the bullets that struck the victims. Understandably frightened, Meadows crawled into the foster care home and hid, and continued to hide even after the police arrived. Scott ultimately died of his injuries, and Max, who was injured, did not appear at defendant's trial.

*People v. McPherson,* 263 Mich. App. at 125-31 (internal footnotes omitted).

As will be explained below, Petitioner was arrested nearly three months after the shooting. While in custody, Petitioner eventually made statements that he shot the victims in self-defense. However, at trial, rather than claiming self-defense, Petitioner denied being the shooter. He instead testified that King, who by this time had been killed by Gaffney and Dorsey, was the shooter. The trial court granted Petitioner's request to read Gaffney's prior testimony into the record in which Gaffney also said that King, not Petitioner, was the shooter.

Petitioner testified that Gaffney told King to shoot the victims because Gaffney thought that they stole his car. He further testified that, after his arrest, he did not want to make a statement. However, while being questioned, Petitioner knew that one of the officers, Investigator James Fisher, had previously arrested his mother and that officer told him that something bad would happen to his mother if Petitioner did not give a statement. Petitioner also testified that Fisher told him that Gaffney was released after he made a statement inculpating King. Petitioner then testified that he told Fisher that King was the shooter. However, Petitioner further testified that he falsely told Fisher that he handed a gun to Gaffney, who handed it to King, because he thought that Fisher would release him upon learning this information. That, of course, did not happen.

### IV. Standard of Review

Under 28 U.S.C. § 2254(d):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

## V.  Procedural Issues

### A.  The Statute of Limitations

#### 1.  The Statute

Respondent argues that the petition should be dismissed procedurally because it was not timely filed.[3]  Under 28 U.S.C. § 2244(d)(1), a one year statue of limitations

---

[3]Respondent also contends that a portion of Petitioner's second and third claims are procedurally defaulted because he raised these claims for the first time in his post-conviction motion and failed to show cause and prejudice for not raising these claims on direct appeal, as required by M.C.R. 6.508(D)(3). The Michigan Court of Appeals and the Michigan Supreme Court rejected Petitioner's post-conviction appeal on the ground that "the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." These orders, however, did not refer to subsection (D)(3) nor did they mention petitioner's failure to raise these claims on his direct appeal as their

applies to an application for writ of habeas corpus by a person in custody pursuant to a

judgment of a state court. The statute provides that the one year period runs from the

latest of:

> (A) the date on which the judgment became final by the conclusion of
> direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by
> State action in violation of the Constitution or laws of the United States is
> removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially
> recognized by the Supreme Court, if the right has been newly recognized
> by the Supreme Court and made retroactively applicable to cases on
> collateral review; or
> (D) the date on which the factual predicate of the claim or claims
> presented could have been discovered through the exercise of due
> diligence.

## 2. The Petition

Here, Petitioner's direct appeal of his conviction ended when the Michigan

Supreme Court denied his application for leave to appeal on March 31, 2005.

Petitioner's conviction would be final for the purposes of the statute of limitations period

on the date that the 90 day time period for seeking certiorari with the U.S. Supreme

---

rationale for rejecting his claim. The trial court rejected the portion of Petitioner's
second and third claims that he raised for the first time in his post-conviction motion
pursuant to M.C.R. 6.508(D)(2), finding that petitioner had previously raised these
claims on direct appeal. Because the last reasoned state court decision rejected these
claims without invoking the provision of M.C.R. 6.508 (D)(3), they are not procedurally
defaulted. *See Guilmette v. Howes*, 624 F. 3d 286, 289, 292 (6th Cir. 2010).
Respondent further claims that the portion of Petitioner's second and third claims that
were raised on petitioner's direct appeal, as well as his fourth claim, are procedurally
defaulted because he failed to object to the errors at trial. Petitioner claims that to the
extent that these claims were unpreserved at the trial level, his trial counsel was
ineffective for failing to object to these errors. Given that the cause and prejudice
inquiry for the procedural default issue merges with an analysis of the merits of
Petitioner's defaulted claims, the better course is to consider the merits of these claims.
*See Cameron v. Birkett,* 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

Court expired.  *See Bronaugh v. Ohio*, 235 F. 3d 280, 283 (6th Cir. 2000).  Petitioner's judgment therefore became final on June 29, 2005, when he failed to file a petition for writ of certiorari with the Supreme Court.  Absent state collateral review, Petitioner was required to file his petition for writ of habeas corpus with this court no later than June 29, 2006 in order for the petition to be timely filed.

However, Petitioner's original petition was signed and dated June 28, 2006 and was received by this Court on July 25, 2006.  Respondent contends that because the petition was actually filed with this Court after the one year limitations period had expired, the petition is untimely.  Respondent is incorrect.  Petitioner states in an affidavit that he submitted the petition through the expedited mail system at the Muskegon Correctional Facility on June 28, 2006.  Applying the prison mailbox rule, Petitioner presented his petition to prison officials on June 28, 2006, a date almost a month before the officials filed it.  As such, the petition was timely filed.  *See Miller v. Collins*, 305 F. 3d 491, 497-98 (6th Cir. 2002).

### 3.  Equitable Tolling

Respondent also argues that when the petition was held in abeyance on February 1, 2007, it was conditioned upon petitioner filing his motion for relief from judgment within sixty days of the issuance of the Court's order.  Because petitioner did not file his motion for relief from judgment until over six months later on August 27, 2007, Respondent says the petition is untimely.

In response, Petitioner says that because of prison transfers and problems with the prison mail system, Petitioner did not receive a copy of the Court's order holding the petition in abeyance until after the sixty day period for filing his state post-conviction

8

motion with the state courts had expired.  Petitioner states in an affidavit that he sent a letter to this Court on March 14, 2007 inquiring about the status of his case.  Petitioner was transferred from the Muskegon Correctional Facility to the Carson City Correctional Facility on May 10, 2007.  After not receiving his legal mail in a timely fashion from the Muskegon Correctional Facility, Petitioner sent a second letter to the Court on July 10, 2007, a copy of which has been submitted to the Court.  The letter contains a time stamp that is used by the Clerk's Office in this district.  Petitioner was transferred to the Bellamy Creek Correctional Facility on July 13, 2007 and placed in segregation, where he had no access to his legal property.  Petitioner was transferred again to the Gus Harrison Correctional Facility on July 20, 2007.  In the beginning of August 2007, Petitioner received his "catch up" mail from the prior prisons that he had been incarcerated at.  Included in this mail was a docket sheet from this Court dated July 18, 2007, which indicated that the Court had held petitioner's case in abeyance on February 1, 2007.  Petitioner says that when he originally arrived at Gus Harrison Correctional Facility, his legal footlocker was confiscated and he had no access to the motion for relief from judgment that he had been working on.  During the week of August 16, 2007, Petitioner was finally given access to his legal footlocker, where he obtained his motion for relief from judgment and mailed it to the Wayne County Circuit Court.

The statute of limitations "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010).  A habeas petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way'" and prevented the

9

timely filing of the habeas petition. *Id.* at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The statute of limitations can be equitably tolled based upon a petitioner's failure to receive a court order or decision where the petitioner can adequately demonstrate that he did not receive a copy of the court decision and that he acted diligently to protect his rights both before and after receiving a copy of the decision. *See Miller v. Collins,* 305 F. 3d at 495-96.

Here, as explained above, Petitioner has presented proof that he did not receive a copy of the Court's February 1, 2007 order holding the petition in abeyance until after July 18, 2007 and that he acted diligently, both before and after receiving a copy of this Court's order, in asserting his rights. Under these circumstances, Petitioner is entitled to equitable tolling.

Overall, the petition is not subject to dismissal as untimely.

## VI. Involuntary Confession - Claim V

The Court will first address Petitioner's claim that his confession should have been suppressed on the grounds that it was involuntarily because he had already invoked his right to counsel.

## A. The *Walker* Hearing Testimony

Petitioner raised the issue of his confession prior to trial. The trial court held a *Walker*[4] hearing to determine the voluntariness of petitioner's confession was conducted on June 19 and July 10, 2001. The testimony from the hearing established the following:

---

[4]*People v. Walker (On Rehearing),* 374 Mich. 331 (1965).

10

- Petitioner was arrested by the Detroit Police at the 13th Precinct during the late evening hours of November 22, 2000 and transported to Detroit Police Headquarters at 1300 Beaubien.

- The following day, on November 23, 2000, Detroit Police Investigator Barbara Simon met with Petitioner and advised him of his *Miranda* Rights. Simon reviewed the constitutional rights form with Petitioner, who indicated that he understood his constitutional rights and placed his initials next to each right.  Petitioner also signed the rights form.  Although Simon attempted to question Petitioner, Petitioner told Simon "fuck this, fuck you, I don't want to talk."  Simon terminated the interview with petitioner and returned him to his cell.  Simon never specifically denied that Petitioner had invoked his right to speak with an attorney. (*Id.* Tr. 6/19/01, pp. 39-41; 71-80).

- On November 24, 2000, Detroit Police Investigator James Fisher met with Petitioner and again advised him of his constitutional rights, using a police constitutional rights form.  According to Fisher, Petitioner indicated that he understood his rights and stated that he was willing to waive them and make a statement.  Fisher testified that Petitioner did not appear sleepy or tired and denied that Petitioner had been deprived of food, water, or restroom facilities.  Fisher denied threatening or coercing Petitioner or making any promises to him.  In his statement to Fisher, Petitioner denied shooting the victim.  Fisher testified that he confronted Petitioner with statements from Cherell King, Lucretia Thompson, and Delano Gaffney, and told Petitioner that he thought he was lying.  According to Fisher, Petitioner agreed to take a polygraph examination.  Fisher contacted Investigator Sims and set up a polygraph examination for November 26, 2000.  Fisher did not specifically rebut Petitioner's claim that he informed Fisher that he wished to speak with an attorney. (*Id.* at pp. 27-69).

- On November 26, 2000, Detroit Police Investigator Dwight Pearson transported Petitioner to another building for him to take a polygraph. (*Id.* at pp. 21-22).  Investigator Andrew Sims testified that he interviewed Petitioner at 10:55 a.m.  Sims advised Petitioner of his constitutional rights and his polygraph rights, and informed Petitioner that he had a right to refuse to take the polygraph test.   According to Sims, Petitioner indicated that he understood his rights, affixed his initials after each of the constitutional and polygraph rights read by him and signed the rights forms, in which he indicated that he was willing to give them up and make a statement. Petitioner then took the polygraph examination, at the conclusion of which Sims told Petitioner that the results of the test indicated that he was not being truthful. Sims asked Petitioner whether he wanted to tell him the truth,

11

to which petitioner indicated that he would.  After Petitioner told Sims that he shot the victim, albeit in self-defense, Sims left the room while Petitioner wrote out his statement. (*Id.* at pp. 80-98).

- Investigator Pearson testified that he transported Petitioner back to the Homicide Section at Detroit Police Headquarters.  At 2:30 p.m., Pearson advised Petitioner again of his constitutional rights.  Petitioner informed Pearson that he understood his rights and was willing to waive those rights and make a statement.  Pearson testified that Petitioner did not appear tired, sleepy, or under the influence of anything, did not ask for food or restroom use, and was not at any point deprived of the foregoing.  Pearson denied forcing or tricking Petitioner to induce his statement.  After Petitioner gave a written statement, which was essentially the same as what he told Investigator Sims, Petitioner reviewed his statement and made no corrections. (*Id.* pp. 3-27).

- Petitioner's mother, Donna McPherson, testified that in October 2000, prior to Petitioner's arrest, two police officers came to her house and transported her to Detroit Police Headquarters for questioning. Donna McPherson's two young children went with her.  Investigator Fisher asked her about Petitioner's whereabouts, as well as about the murder.  Donna McPherson testified that the police told her that if she did not cooperate with them, the police would take her other sons from her. (Tr. 7/10/01, pp. 3-9).

- Petitioner testified that he was arrested with Cherell King.  Petitioner was eventually transferred to the Homicide Section and turned over to Investigator Terrill Shaw.  Petitioner informed Shaw that he knew nothing about the shooting, did not want to talk to him, and requested an attorney. Shaw left the room and Petitioner was transferred to a holding cell. (*Id.* pp. 12-18, 29-30).

- Petitioner testified that the following day, Investigator Simon attempted to interrogate him, but Petitioner told her that he knew nothing about the crime, did not want to talk to her, and again requested an attorney.  Petitioner called Simon a "bitch" and told her to leave him "the fuck alone."  Simon left the room and petitioner was taken back to his cell. (*Id.* at pp. 18-26).

- Petitioner testified that Investigator Fisher spoke to him the following day, after Petitioner had finished eating breakfast.  Petitioner told him that he did not know what he was talking about and again requested a lawyer.  Fisher informed Petitioner that he had no choice, because his friends had told police that he either watched the crime or took part in it.  Fisher promised Petitioner that if he told him what he wanted to hear, he could leave just like

others who had cooperated with the police.  Fisher informed Petitioner that he was going to give King the opportunity to make a statement as well and that he would go with the one that was the best story.  Petitioner testified that he knew that King committed the crime, but asked Fisher to leave him alone. (*Id.* at pp 27-32).

• Petitioner testified that he remained in the interrogation room for about two hours and the police ignored his request to use the bathroom.  When Fisher returned, he showed Petitioner King's typed statement and warned him that if he did not want to go to prison, he better start answering questions.  Fisher reviewed King's statement with Petitioner, in which King told the police that Petitioner had shot somebody. Petitioner became scared and nervous for himself and his family.   Petitioner testified that Fisher promised him he could go home if he signed a statement implicating King in the crime.  Petitioner testified that he again asked for an attorney, but Fisher told him that no lawyer could be involved because he was a witness.  Petitioner again informed Fisher he did not want to talk, at which point Fisher threatened petitioner that he would "go get" his mother and that he could take her kids from her.  Petitioner informed Fisher that he did not shoot anyone and that King committed the shooting, although he did not actually witness the shooting.  Petitioner testified that Fisher wanted Petitioner to tell the police that he actually saw King commit the murder.  Petitioner testified that Fisher handed him a typed statement, dated November 24, 2000.  Petitioner said he placed his signature four times on the first page, on the bottom of each of the six pages, and five times on the last page, without reading the statement over.  Petitioner explained that he did not read it because Fisher said they had a deal.  Petitioner denied giving the information contained in the statement and denied placing his initials on the statement.  Petitioner testified that  Fisher did not advise him of his rights until after the written statement was completed.  Petitioner denied that he and Fisher talked about a polygraph. (*Id.* at pp. pp. 32-38, 43 44-49, 52-53; 69-72)

• Petitioner said that on November 26, 2000, he was transported by Investigator Pearson to another building.  Petitioner informed Pearson he did not want to speak with anyone but was told he had no choice.  Petitioner met Sims, who informed him that he was there to take a polygraph.  Petitioner advised Sims that he never requested a polygraph and did not want one.  Pearson informed Petitioner that he either had to take the polygraph or be charged with murder.  Petitioner signed the advice of rights form and took the polygraph test.  During the test, Petitioner refused to answer some of the questions.  Afterward, Sims informed Petitioner that the polygraph indicated he was lying.  Sims exited the room to find Pearson.  When Sims returned with Pearson, Pearson warned Petitioner that he better

confess to the crime or tell the police that he saw King commit the murder. Petitioner testified he did not want to say that King committed the murder because he was scared for himself and his family. Petitioner testified that Pearson grabbed him by the hood and warned him to quit playing games. Sims asked Pearson to leave the room and then told Petitioner that if he confessed, he could save himself a lot of trouble. Sims informed Petitioner that he knew that he killed the man. Petitioner testified that he "just ended up writing out what [Sims] told [him] to." Sims told Petitioner that his best option was to state that he shot the victim in self-defense. (*Id.* at pp. 63).

- Petitioner was subsequently transported back to Detroit Police Headquarters and placed in an interrogation room. Pearson then came into the room and petitioner executed another advice of rights form, before making another statement that was the same as the one he gave Sims. (*Id.* at pp. 63-65).

- Investigator Terrill Shaw testified, in rebuttal, that he took a statement from King on November 22, 2000, but that he never had any contact with Petitioner. (*Id.* pp. 97-104).

## B. The Trial Court's Decision

The trial court denied Petitioner's motion to suppress the statement. (*Id.* at pp. 125-32). The trial court admitted that "Some of the things that Mr. McPherson testified to concerns me very much as a citizen." (*Id.* at p. 126) and noted that some of the "inconsistencies" in Petitioner's testimony troubled him. However, the trial court stated that some of Petitioner's responses were "candid" while other things that he testified to "don't make sense." (*Id.* at pp. 126-27). The trial court then stated:

> *The police seem to adhere to policies in some respects and they don't in others. Some officers seem to abide by the constitution and recognize and respect his rights; others don't.* I'm concerned, Mr. Beadle, by three different investigators, in a homicide case, looking at the [petitioner's] education level, which is one of the factors I'm supposed to look at, I think you'd agree, or lack of education. Now one has his education at seventh grade, one at eighth, and one at nine. Two say he achieved his GED; one in '96, one in '97. Never happened.
>
> *Now in a homicide case, I would think that they'd go to great lengths to*

14

> *ensure that he's represented by Counsel, that honor any requests that he made, if in fact he made them.*

(*Id.* at p. 127)(emphasis added).

The trial court then went through the list of factors to be considered in determining the voluntariness of a confession. The trial court stated that he was concerned by the "prolonged nature of the questioning" in this case, as well as the length of the detention. (*Id.* at p. 128). Although noting that Petitioner did not indicate that he had been deprived of sleep, he pointed to testimony from Petitioner in which he had to sleep either on a hard mattress or without a mattress, which caused him pain. (*Id.* at p. 129). The trial court then stated that "If I'm to believe the police version, he never requested an attorney or a phone call." (*Id.*). However, the trial court did not make a specific factual finding that Petitioner had never requested the assistance of counsel prior to making his statement. The trial court also noted that some of the police officers honored Petitioner's request not to speak with him, while others did not. He informed defense counsel that he was concerned with the time element involved in the taking of the statements, in that Investigator Fisher did not interact with Petitioner until he had been in custody for 46 hours. (*Id.*). The trial court was also concerned about any threats that may have been made to Petitioner's mother concerning her children, "if they're in fact true." (*Id.* at p. 130). The trial court then stated: "Quite honestly I believe many of the statements that Mr. McPherson said were made to him." (*Id.* ). Ultimately, however, the trial court denied the motion to suppress, finding that under the totality of the circumstances, the confession was voluntary. (*Id.* at pp. 130-31).

15

## C.  Petitioner's Statements Admitted at Trial

At trial, Petitioner's confessions to Sims and Pearson were introduced into

evidence.  Petitioner gave the following statement to Investigator Sims:

> "I, Lanier McPherson, was only going, trying to ask the two guys had they
> seen a Chevy that had been stolen from a funeral home?  And while doing
> so, the guys became hostile, and began to reach like they had weapons.
> So, I fired the gun at them, only to scare them away, because I didn't want
> to be hurt by them or any weapons they were trying to pull out."

(Tr. 4/18/2002, pp. 17-18).

Petitioner made a similar statement to Investigator Pearson:

> "Question [by Investigator Pearson]: Tell me what happened over at
> Linwood and West Grand Blvd.

> Answer [by petitioner]: (Hondo)", which is in parentheses, "Delano Gaffney,
> while over at Cole's Funeral Home, stated that there was two guys walking
> down West Grand Blvd. That knew something about this car he had that
> was stolen. He asked us, did anyone have a heater on them. That's when
> I called my girlfriend and told her to bring my nine millimeter up to the
> funeral home.  It took her five to ten minutes to get up to the funeral home.
> After the gun was brought up to the funeral home, Tick, which is Sharell
> King, Hondo, and myself got into Dune's, which is Marcel Dorsey, Jeep
> Grand Cherokee and went riding around looking for both Hondo's car and
> two guys that were walking down West Grand Blvd.  While riding, we saw
> the two guys walking on West Grand Blvd.  I got out to ask the two guys
> about Hondo's car, because Hondo was upset.  When I walked over to the
> two guys, I asked them have they seen a gold Chevy with twenties?  They
> said, no, dog, we haven't seen one, and that they didn't know what I was
> talking about.  I asked them where they were walking"

> Q: [by the prosecutor] While they were walking?

> A [by Investigator Pearson]: I asked, yes, that's right. [Pearson narrating
> petitioner's statement]: "I asked them, while they were walking, did they see
> one?  They said, dog, we told you we didn't see no car.  That's when one
> of the guys put his hand under his shirt.  And the other guy put his hands in his
> pocket.  That's when I pulled out my nine millimeter, and fired about nine
> shots at them.  After I fired the shots, I got back into the Jeep and we left.

> Question [by Investigator Pearson]: Where is the nine millimeter now?

16

Answer [by petitioner]: I don't know.  Tick sold it.

Question: Did you know who Tick sold the gun to?

Answer: No.

Question: What color is the Jeep Grand Cherokee?

Answer: Brown, four door.

Question: What did you do with the gun after you shot the two guys?

Answer: I gave it to Tick, and they said they would get rid of it.

Question: Who was driving the Jeep?

Answer: Dune.

Question: What color was the nine millimeter?

Answer: A stainless steel.

(*Id.* at pp. 45-46).

### D.  The Michigan Court of Appeals' Decision

On appeal, Petitioner contended that his confessions should have been

suppressed on the grounds that they had been involuntarily made and that he had

invoked his right to counsel.

The Michigan Court of Appeals rejected Petitioner's claim, reasoning:

Whether defendant's Fifth Amendment right to counsel was violated, and
whether defendant's statements to Sims and Pearson were voluntary turned
principally on credibility issues, which were resolved against defendant.
Giving deference to the trial court's superior position to evaluate the
credibility of the witnesses, defendant has not established that his Fifth
Amendment right to counsel was violated.

Also, we have independently reviewed the record, and again giving due
deference to the trial court's findings, we find no basis for disturbing the
court's decision that defendant's statements were voluntary. The delay
between defendant's initial arrest for an unrelated matter on November 22,

17

2000, and his statements to Sims and Pearson on November 26, 2000, is a relevant factor in determining whether the statements were voluntary, but the principal focus is not on the mere passage of time, but on the effect of the delay on defendant.  The evidence at the suppression hearing supports the trial court's findings that defendant knew what he was doing when he signed the advice-of-rights forms and that, in light of the statements provided by Gaffney and King, defendant agreed to be taken for a polygraph examination and stated that he wanted to clear his name. Moreover, the delay between defendant's consent for the polygraph examination and the resulting examination was because Sims, the polygraph examiner, was not available until two days after Fisher's questioning of defendant. Defendant's statement to Sims occurred at the polygraph examination under circumstances in which defendant was told that he was untruthful. Defendant's statement to Pearson was made after the statements to Sims and contained the same admissions. The totality of the circumstances surrounding both statements indicates that they were made voluntarily.

*People v. McPherson,* 263 Mich. App. at 136-37 (internal citations omitted).

## E. Decision

### 1. Clearly Established Federal Law

Petitioner not only argues that his confession should have been suppressed because it was involuntary, but also that it should have been suppressed because he had invoked his right to counsel several times with the police.  The federal law on this is clearly established.  A prosecutor may not use a defendant's statements which stem from custodial interrogation unless the prosecutor can demonstrate the use of procedural safeguards which are effective to secure a defendant's privilege against self-incrimination.  *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).  Unless other means are devised to inform a suspect of his right to silence and a "continuous opportunity to exercise it", the following warnings are required to be given to a suspect:

1. the person must be warned that he has a right to remain silent;
2. that any statement he does make may be used against him;
3. and that he has a right to the presence of an attorney, either appointed or retained.

18

*Miranda,* 384 U.S. at 444.

When an accused invokes his right to counsel during custodial interrogation, that interrogation must cease until counsel is made available, unless the accused initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The rule in *Edwards* is considered "a corollary to *Miranda's* admonition that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present.'" *Arizona v. Roberson*, 486 U.S. 675, 680 (1988)(quoting *Miranda,* 384 U.S. at 474). The rationale behind *Edwards* is that once the accused informs law enforcement officials "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010)(quoting *Roberson*, 486 U.S. at 681). Indeed, "to a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling." *Roberson,* 486 U.S. at 686. Finally, the mere fact that a subsequent officer who interrogates a suspect is unaware that the suspect invoked his right to counsel with a prior officer does not justify any failure to honor the suspect's request for counsel, because *Edwards* focuses on the state of mind of the suspect and not of the police. *Roberson,* 486 U.S. at 687.

## 2. Findings

On habeas review, a federal court must presume the correctness of state court

factual determinations, which may be rebutted with clear and convincing evidence. *Bailey v. Mitchell*, 271 F. 3d 652, 656 (6th Cir. 2001); 28 U.S.C. § 2254(e)(1).  A state court's finding that a habeas petitioner did not make an unequivocal request for counsel and that the statement was voluntarily made is entitled to the presumption of correctness, where the petitioner fails to present clear and convincing evidence to rebut that presumption.  *See Pritchett v. Pitcher*, 117 F. 3d 959, 963 (6th Cir. 1997). Here, Petitioner has presented clear and convincing evidence to rebut any express or implicit finding of fact that Petitioner did not make an unequivocal request for counsel. First of all, the record does not support a factual finding that Petitioner never invoked his right to counsel.  Although the trial court mentioned in passing that "If I'm to believe the police version, he never requested an attorney", the trial court never expressly made a finding of fact on whether Petitioner invoked his right to counsel.  A review of the testimony of Investigators Simon and Fisher, two of the officers whom Petitioner claims that he invoked his right to counsel with, establishes that neither officer ever denied that Petitioner had requested to speak with an attorney.  Simon, in fact, admitted that Petitioner had told her very emphatically that he did not want to talk to her.  Their testimony lends credence to Petitioner's assertion that as part of the exercise of his right to remain silent, he invoked his right to counsel.  Finally, Petitioner testified at the *Walker* hearing that he repeatedly requested to speak with an attorney and that his requests were denied.  The trial court itself acknowledged that several of the officers did not honor Petitioner's request not to be interrogated, which also lends support to Petitioner's claim that he invoked his right to counsel.  The trial court's comments, carefully read, suggest that the trial court implicitly found that Petitioner had

20

invoked his right to counsel:

> *Now in a homicide case, I would think that they'd go to great lengths to ensure that he's represented by Counsel, that honor any requests that he made, if in fact he made them.*"

In light of all the testimony from the *Walker* hearing and the trial court's comments, the Michigan Court of Appeals' rejection of Petitioner's Fifth Amendment claim was both an unreasonable application of clearly established federal law and an unreasonable determination of the facts.  Rather than carefully dissecting the record, the Michigan Court of Appeals deferred to what it believed were explicit factual findings by the trial court regarding Petitioner's confession.  As noted above, however, the trial court never explicitly found that Petitioner did not invoke his right to counsel.  At best, the trial court was ambiguous on whether Petitioner had invoked his right to counsel. The record supports a factual finding that Petitioner did invoke his right with officer Simon and later with Fisher.  Rather than honoring this right, Fisher and two other officers, Pearson and Sims, continued to initiate questioning with Petitioner over the course of a few days.  This was in clear violation of *Edwards*.  The Michigan Court of Appeals' contrary conclusion is an unreasonable determination of the facts which resulted in a decision which is an unreasonable application of *Edwards* and *Miranda.* Petitioner is entitled to habeas relief.  *See Dixon v. Houk,* 627 F. 3d 553, 558 (6th Cir. 2010).

The fact that the officers gave Petitioner his *Miranda* rights before questioning him does not sanitize the violation.  Petitioner's confession was in response to police-initiated questioning, the evil that *Edwards* sought to foreclose:  "when an accused has invoked his right to have counsel present during custodial interrogation, a

21

valid waiver of that right cannot be established by showing only that he responded to
further *police-initiated custodial interrogation* even if he has been advised of his rights."
*Edwards*, 451 U.S. at 484 (emphasis added); *see also Oregon v. Bradshaw*, 462 U.S.
1039, 1044 (1983) (*Edwards* rule designed to protect accused in police custody from
being badgered by police officers).  Put simply, the trial court and Michigan Court of
Appeals' conclusion that Petitioner's Fifth Amendment right to remain silent was not
violated is unreasonable.

### 3.  Harmless Error

The question is whether the error was harmless.  *See, e.g., Hill v. Brigano*, 199
F.3d 833, 842-43 (6th Cir. 1999) (applying harmless-error analysis to *Edwards*
violation).  For purposes of determining whether federal habeas relief must be granted
to a state prisoner on the ground of federal constitutional error, the error must be found
to have had a substantial and injurious effect or influence in determining the jury's
verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

In *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995), the Supreme Court held that
when a federal court is in "grave doubt" about whether a trial error of federal
constitutional law had a substantial and injurious effect or influence in determining the
jury's verdict, the error is not harmless and the petitioner wins.  The focus in such a
situation is not merely whether there is enough evidence to support the result, apart
from the phase affected by the error.  It is, rather, even so, whether the error itself has
substantial influence.  If so, or a judge is left in grave doubt, the conviction cannot
stand.  *Id.* at 438.

This Court has grave doubts about whether the erroneous admission of

22

Petitioner's inculpatory statements to the police had a substantial and injurious effect or influence on the jury's verdict.  Apart from Petitioner's statements that he shot the victims, there was only one eyewitness, Montez Meadows, who testified against Petitioner.  Meadows did not initially report the shooting to the police, but had to be located by a family member of the victim.  Meadows initially told the police that although she witnessed the shooting, she could not identify the two men involved in the shooting.  At petitioner's first trial, Meadows did not identify Petitioner as being the shooter.  By contrast, Petitioner presented evidence, both at his first and second trials, to suggest that King was the shooter.  In light of the tenuous nature of the evidence against petitioner, the Court concludes that the admission of petitioner's inculpatory statements, in violation of his *Miranda* rights, had a substantial and injurious effect or influence upon the jury.

Petitioner is therefore entitled to a new trial in the state courts without his confessions being used against him in evidence.  *See Jackson v. Denno,* 378 U.S. 368, 394 (1964).[5]

### VII.  Petitioner's Remaining Claims

### A.  Confrontation Clause - Claims I and II

### 1.  Claim I - King's Statement

In his first and second claims, Petitioner contends that he was denied his Sixth Amendment right of confrontation when the prosecutor was permitted to confront him

---

[5]Because Petitioner's statements were admitted at trial in violation of *Miranda* and *Edwards,* it is unnecessary to discuss the other factors advanced by Petitioner to support his claim that his statements were involuntarily made.

with the out-of-court statement from King, which accused Petitioner of being the shooter.

The Michigan Court of Appeals rejected this claim, finding that King's out of court statement had been admitted for a non-hearsay purpose, namely to impeach Petitioner's statement that King was the shooter, particularly in light of Petitioner's earlier testimony that King had been murdered by Gaffney and Dorsey because of a dispute over money and because King was looking to "rat people out" in court. *McPherson,* 263 Mich. App. at 133-35.

Out of court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court.  *See Crawford v. Washington,* 541 U.S. 36, 68-69 (2004).  However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.,* at 59, n. 9.  The nonhearsay aspects of a co-defendant's confession, which are offered not to prove what happened at the scene of a crime, but what happened when the defendant confessed, raise no Confrontation Clause concerns. *Tennessee v. Street,* 471 U.S. 409, 414 (1985); *See also Adams v. Holland,* 168 F. App'x 17, 19-21 (6th Cir. 2005).

The Michigan Court of Appeals' rejection of this claim was not an unreasonable application of clearly established law.  The prosecutor did not introduce the contents of King's statement into evidence, but simply brought out the fact that King "ratted" petitioner out.  The prosecutor did not introduce this evidence to prove that Petitioner

24

was the shooter, but to impeach his testimony that King was the shooter.  This was a proper non-hearsay purpose.

Petitioner also argues that the trial court violated his right to present his defense when he ruled that if Petitioner presented testimony that King confessed to other persons that he was the shooter, the prosecutor would be permitted to introduce King's statement to the police, in which he accused Petitioner of being the shooter.  Because defense counsel did not want King's statement to be admitted at Petitioner's second trial, he chose not to present evidence that King had confessed being the shooter.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense.  This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967).

Here, the trial court did not preclude Petitioner from presenting evidence that King confessed to being the shooter.  Instead, defense counsel chose not to present this evidence after the trial court ruled that the prosecutor would be permitted to present King's statement to the police, which incriminated Petitioner, if such evidence was presented.  Petitioner cannot convert a tactical decision not to introduce evidence into a constitutional violation of the right to present evidence generally. *See Rodriguez v. Zavaras*, 42 F. Supp. 2d 1059, 1150 (D. Colo. 1999).  Moreover, Petitioner presented evidence at trial that King was the shooter.  Accordingly, Petitioner was not prevented from presenting a defense.

### 2.  Claim II - Meadow's Statement

In his second claim, Petitioner contends that his confrontation rights were

25

violated because the trial court limited his cross-examination of Meadows.  At trial,

Meadows was frightened and had great difficulty testifying.  Meadows indicated that

she did not go the police at first because she was afraid.  After the shooting, Meadows

discussed the matter with her mother, her daughter, and her pastor.  The police spoke

with Meadows a year and a half after the shooting, but she did not how they knew she

was a witness.  Meadows testified that although she had no doubt that Petitioner was

one of the shooters, she admitted that she did not identify Petitioner at his first trial. (Tr.

4/16/02, pp. 35-38).

Defense counsel extensively cross-examined Meadows.  Defense counsel

elicited an admission from Meadows that she never told anyone that she had seen

Petitioner prior to the shooting, which contradicted her trial testimony that she had seen

petitioner once or twice prior to the shooting at a gas station.  Defense counsel

questioned Meadows about the fact that she had never told the police that Petitioner

was the shooter.  Defense counsel also questioned Meadows at great length about her

descriptions of the perpetrators, and asked here several times whether she understood

how important and "deathly serious" the trial proceedings were. (*Id.* at pp. 39-56).

After giving Meadows a second break to regain her composure, the trial court,

outside of the jury's presence, directed the attorneys to limit their examination of the

witness.  When defense counsel informed the trial court that he was limiting the

questions that he intended to pursue, the trial court replied:

> Okay, do you know how long you have been interrogating this witness,
> [Defense Counsel]?  And you know this Court has a right and can invoke its
> discretion in terms of making sure that this trial is run fairly, okay, and
> without any undue pressure on the witness.  You have done your job, in
> terms of representing your client, in this Court's opinion.  I don't pretend to

26

tell you how to do your job, but the Court has given you great latitude.

Now if you chose to use the last forty-five, fifty minutes to an hour on an issue that consistently was the same answer, which is, no, she didn't tell, we're making a record of this, by the way.  She didn't tell the police everything, she told quite candidly why she didn't make certain admissions.  You have spent the last fifty minutes on that particular point.  And that is your decision.  But, the Court has a right and it has a discretion to limit cross-examination, particularly now under these circumstances. . . . this witness is clearly distraught, and it's going to prejudice the trial resulting in a mistrial if this Court continues to allow the course to proceed.

* * *

And just so the record is clear, because they cannot see the demeanor of this witness, this witness is distraught, this witness is close to being, in this Court's estimation, close to a breakdown. . .

(*Id.* at pp. 57-58).

The trial court indicated that it would limit defense counsel to an additional ten or fifteen minutes and the prosecutor to another five to ten minutes on re-direct. (*Id.* at p. 58).  When Meadows returned to the witness stand, defense counsel was permitted to continue cross-examining her.  Meadows admitted on cross-examination that she did not live in the neighborhood where the shooting took place or in the neighborhood where the gas station was located where she had previously seen Petitioner.  Meadows also admitted that Petitioner's hair looked different than when she had seen him at the gas station.  Meadows further admitted that she had been contacted by the victim's stepfather and that they had several conversations about the case. (*Id.* at pp. 60-74).  The trial court allowed defense counsel to conduct re-cross-examination. (*Id.* at pp 77-78).

"[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever

27

extent, that the defendant might wish.'" *United States v. Owens*, 484 U.S. 554, 559

(1988)(internal quotations omitted).  The Confrontation Clause does not prevent a trial

court from imposing limits on a defense counsel's inquiry into potential bias of a

prosecution witness; to the contrary, trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such cross-

examination based on concerns about, among other things, harassment, prejudice,

confusion of the issues, a witness' safety, or interrogation that is repetitive or only

marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Here, the trial court limited defense counsel's cross-examination of the witness

primarily because he continued to ask her the same questions over and over again.

Defense counsel was given an adequate opportunity to cross-examine Meadows and

exercised that right at great length.  The trial court only limited counsel from asking

repetitive questions, which fall "within the 'wide latitude' that trial courts are to be

accorded."  *See United States v. Hynes*, 467 F.3d 951, 960 (6th Cir. 2006).  Moreover,

although Petitioner claims that he was precluded from bringing to the jury's attention

defects in Meadow's "character affecting truthfulness and of her background" which

were necessary to properly assess her testimony, Petitioner does not identify

specifically what these "defects" were or what lines of questioning he was  precluded

from asking regarding Meadows's character or background.  Because Petitioner has

failed to identify precisely the information that he was prevented from eliciting from

Meadows on cross-examination, he is not entitled to habeas relief on his claim.  *See*

*Takacs v. Engle*, 768 F.2d 122, 125 (6th Cir. 1985).[6]

## B.  Prosecutorial Misconduct - Claim III

Petitioner contends that he was deprived of a fair trial because of prosecutorial misconduct.  To prevail on a claim of prosecutorial misconduct, a petitioner must show that the alleged misconduct infected his trial with such unfairness as to make the resulting conviction a denial of due process.  *Byrd v. Collins*, 209 F. 3d 486, 529 (6th Cir. 2000) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986))(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Courts must keep in mind that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "Therefore, even if the prosecutor's conduct was 'undesirable or even universally condemned,' *Darden*, 477 U.S. at 181 (quotation marks and citations omitted), it does not constitute a due process violation unless the conduct was 'so egregious so as to render the entire trial fundamentally unfair.'" *Byrd*, 209 F. 3d at 529 (end citations omitted).

Petitioner first claims that the prosecutor injected facts that were not supported by the record when he made a reference to King being shot in the head and being placed in a dumpster. (Tr. 4/22/2002, p. 174).

The Michigan Court of Appeals rejected this claim as follows:

---

[6]As part of his sixth claim, Petitioner claims that defense counsel was ineffective for failing to properly preserve this issue for appellate review.  Because Petitioner has failed to show that defense counsel was prevented from adequately cross-examining Meadows, he cannot establish that defense counsel was ineffective for failing to object more strenuously to the trial court's ruling concerning the time limits on the cross-examination.

29

> Although the prosecutor's remark was not supported by the evidence, the jury heard testimony about Gaffney being charged with King's murder. Furthermore, defendant himself testified about this fact, that he initially implicated Gaffney in King's murder, and that Gaffney was tried for the murder of King.  Moreover, as the trial court observed when addressing defendant's motion for a mistrial, defendant did not timely object to the prosecutor's remark.   Under the circumstances, the trial court's jury instruction that "[t]he lawyers' statements or arguments, they are not evidence" was sufficient to dispel any prejudice.

*People v. McPherson,* 263 Mich. App. at 139-40 (internal footnote omitted).

It is improper for a prosecutor during closing arguments to bring to the jury any purported facts which have not been introduced into evidence and which are prejudicial. *Byrd*, 209 F. 3d at 535.  However, prosecutors must be given leeway to argue reasonable inferences from the evidence. *Id.*

Here, there was some evidence presented that King had been murdered, therefore, the prosecutor's remark did not violate Petitioner's right to a fair trial.  Any prosecutorial misconduct in attempting to inject facts that had not been introduced into evidence was also ameliorated by the trial court's instruction that the lawyers' comments and statements were not evidence.  *See Hamblin v. Mitchell,* 354 F. 3d 482, 495 (6th Cir. 2003).

As a related argument, Petitioner claims that the prosecutor attempted to use King's out of court statement for substantive evidence of his guilt, and not merely as impeachment evidence.  In support, Petitioner relies on comments made by the prosecutor in closing argument about Meadows, which linked her to King and, according to Petitioner, encouraged the jurors to use King's out-of-court statement as substantive evidence, just as they were to use Meadows' testimony as substantive evidence. (Tr. 4/22/2002, pp. 175-76).

30

There is no evidence that the prosecutor used King's statement as substantive

evidence in his closing argument.  The prosecutor never mentioned King's statement in

closing argument.  The prosecutor's remark that "part of that information the police has

has been buried with the man who got shot in the back of the head and got dumped in

Hamtramck", when viewed in context, was made to impeach Petitioner's credibility:

> Well, part of that information the police has been buried with the man who
> got shot in the back of the head and got dumped in Hamtramck.  So, when
> he gets confronted with that, he knows the truth.  What Investigator Sims
> says, this is all Investigator Sims does.  He says, people don't come up,
> when you're interviewing a person and they had some kind of legitimate
> basis for their actions, they kind of come clean with the facts.  Mr.
> McPherson didn't do that.

(Tr. 4/22/2002. p. 174).

Moreover, even if the prosecutor did use this statement improperly in his closing

argument, the claim is defeated by the trial court's instruction that the prosecutor's

argument was not evidence.  *Adams v. Holland,* 168 F. App'x at 20.  The prosecutor's

possible "use of the statement in argument did not transmute the statement's

evidentiary use from impeachment to substantive evidence of guilt."  *Id.* at 21.

Petitioner also contends that the prosecutor vouched for Meadows' credibility by

suggesting that she was in danger, just "wanted to live out the day", and "doesn't want

to end up like Cherell King."  A prosecutor may not express a personal opinion

concerning the guilt of a defendant or the credibility of trial witnesses, because such

personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor

"exceeds the legitimate advocates' role by improperly inviting the jurors to convict the

defendant on a basis other than a neutral independent assessment of the record

proof." *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999)(internal citations

31

omitted).  It is worth noting, however, that the Sixth Circuit has never granted habeas

relief for improper vouching.  *Byrd,* 209 F. 3d at 537 and n. 43.

Petitioner is not entitled to habeas relief on this claim because the prosecutor's

comment was brief and isolated.  An isolated instance of vouching does not make a

state trial so constitutionally infirm so as to justify federal habeas relief.  *See e.g.*

*Joseph v. Coyle,* 469 F. 3d 441, 474 (6th Cir. 2006).  Moreover, the jury was instructed

that the lawyers' statements and arguments were not evidence, which cured any

prejudice that may have arisen from any improper vouching.  *Byrd,* 209 F. 3d at 537.

Finally, Petitioner argues that the prosecutor's comments about Meadows being

afraid of Petitioner were used to convince the jurors that Petitioner was a "bad

character."  This argument is not well-taken.  The prosecutor did not bring up

Meadows' fear of testifying to establish petitioner's propensity to commit this offense,

but to explain why Meadows had initially failed to identify Petitioner as the perpetrator.

Accordingly, the prosecutor's remarks about Meadows being fearful did not amount to

prosecutorial misconduct.  *See U.S. v. Birdsong,* 330 F. App'x 573, 579-80 (6th Cir.

2009).  Petitioner is not entitled to habeas relief on his prosecutorial misconduct.[7]

### C.  Sims' Testimony - Claim IV

Petitioner next contends that he was deprived of a fair trial when Investigator

Sims testified, in response to a question from defense counsel, that suspects never

---

[7]Petitioner also claims that defense counsel was ineffective for not objecting to the alleged instances of prosecutorial misconduct.  Because the prosecutor's remarks did not deprive petitioner of a fundamentally fair trial, Petitioner cannot show that defense counsel was ineffective in this regard.  *See Slagle v. Bagley*, 457 F. 3d 501, 528 (6th Cir. 2006).

confess unless they are actually guilty.

In *Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988), the Sixth Circuit held that it was fundamentally unfair and a violation of due process to permit a detective to testify as an expert witness that all the evidence linked the petitioner, and no one else, to the crime. The Sixth Circuit concluded that "[t]he opinion-testimony had a direct influence on the jury's consideration of petitioner's guilt or innocence." *Id.* at 287.

The Sixth Circuit's holding in *Cooper* does not entitle Petitioner to habeas relief. First, the prosecutor did not elicit Sims' testimony. Instead, Sims volunteered this remark in response to a line of questioning from defense counsel on cross-examination, in which counsel suggested that Sims used a method of interrogation to get a suspect to admit a crucial fact of the crime by providing that person with a theory that minimizes their moral culpability while at the same time admitting a particular fact of the crime. (Tr. 4/18/2002, pp. 19-25). Given that Sims' remark was made in response to a question from defense counsel and the remark about innocent persons not confessing was rather limited, petitioner was not deprived of a fair trial. *See Nieto v. Lamarque*, 410 F. App'x 37, 39 (9th Cir. 2010). Secondly, Sims was not presented as an expert witness. Third, the jury was instructed to judge a police officer's testimony by the same standard as the testimony of any other witness. (Tr. 4/23/2002, pp. 10-11). *See e.g. Norton v. Boynton,* 2011 WL 282433, * 8 (E.D. Mich. Jan. 26, 2011).[8]

_____

[8]As noted by another district judge, "*Cooper* was decided prior to Congress' adoption of the AEDPA...so the *Cooper* court owed no deference to the state court decision on these issues." *Dorsey v. Banks*, 749 F. Supp. 2d 715, 738 (S.D. Ohio 2010). The court in *Dorsey* indicated that he had "been unable to locate a single case decided by the Sixth Circuit Court of Appeals, apart from *Cooper*, where a prosecutor's questioning of a law enforcement officer about the truthfulness of a witness led to the

Petitioner is not entitled to habeas relief on his fourth claim.[9]

### D.  Ineffective Assistance of Counsel - Claim VI

As noted above, Petitioner claims that defense counsel was ineffective in several respects.  Because the Court has rejected all of Petitioner's claims related to the alleged ineffectiveness, he is not entitled to habeas relief on this claim.

### VIII.  Conclusion

Petitioner's Fifth Amendment right against self-incrimination was violated when the police obtained inculpatory statements from him after he had invoked his right to counsel.  Accordingly, the Court GRANTS Petitioner habeas relief on his fifth claim.

**UNLESS THE STATE TAKES ACTION TO AFFORD PETITIONER A NEW TRIAL WITHOUT THE USE OF PETITIONER'S ILLEGALLY OBTAINED CONFESSIONS WITHIN NINETY (90) DAYS OF THE DATE OF THIS DECISION, HE MAY APPLY FOR A WRIT ORDERING RESPONDENT TO RELEASE HIM FROM CUSTODY**.

The petition is DENIED as to Petitioner's first, second, third, fourth, and sixth claims.  However, should Petitioner chose to appeal, a certificate of appealability is GRANTED with respect to Petitioner's first, second, third, fourth, and sixth claims as

---

grant of a writ of habeas corpus."  *Id.*  This is a further reason to deny Petitioner's claim.

[9]Because Sims's remark was a non-responsive answer to a legitimate question from defense counsel which was made as part of a strategy to suggest that Sims had suggested the self-defense story to petitioner to obtain his confession, Petitioner cannot show that defense counsel was ineffective.  *See Hodge v. Haeberlin*, 579 F. 3d 627, 641 (6th Cir. 2009).

jurists of reason could debate whether the claims should be resolved differently.[10]  See

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

      SO ORDERED.


                               S/Avern Cohn
                               AVERN COHN
                               UNITED STATES DISTRICT JUDGE


Dated:  July 25, 2011


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 25, 2011, by electronic and/or ordinary mail.


                               S/Julie Owens
                               Case Manager, (313) 234-5160

---

[10]"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.